**Mary E. COOPER, Plaintiff,**

v.

**UNITED VACCINES, INC. and The Home Insurance Company, Defendants.**

**No. 99–C–735.**

United States District Court, E.D. Wisconsin.

Oct. 26, 2000.

Adrian P. Schoone, Schoone Leuck Kelley Pitts & Knurr, Racine, WI, Todd M. Johnson, Johnson Law Group, Minnetonka, MN, Michael J. Jassak, Habush Habush Davis & Rottier, Racine, WI, for Plaintiffs.

James J. Dries, Christopher J. Conrad, Philip J. Tallmadge, Nelson Dries Connell & Kramer, Brookfield, WI, for Defendants.

## DECISION AND ORDER

RANDA, District Judge.

This matter comes before the Court on a motion for summary judgment by the defendant, United Vaccines, Inc. ("UVI"). The defendant's summary judgment motion raises the question of whether, and to what extent, the claims of the plaintiff, Mary E. Cooper ("Cooper"), are preempted by federal regulations governing animal vaccines. Also before the Court is UVI's motion for sanctions. According to UVI, the plaintiff should be sanctioned and this action should be dismissed because evi-

dence central to UVI's defense has been intentionally destroyed by the plaintiff. The Court has jurisdiction over the subject matter of this case pursuant to 21 U.S.C. § 154 and 28 U.S.C. § 1331 and venue is proper in this judicial district under 28 U.S.C. § 1391. For the reasons set forth below, the Court agrees with UVI that four of Cooper's five claims are preempted by federal law and that, concerning the fifth, plaintiff has failed to meet her burden in opposing summary judgment. Alternatively, the Court finds that the plaintiff's spoliation of critical evidence warrants dismissal of her claims.

## BACKGROUND

The plaintiff, Mary E. Cooper, is the widow of Paul Cooper and the sole surviving joint tenant of a business known as "Poor Paul's Place" in Mukwonago, Wisconsin. Defendant's Proposed Findings of Fact ("DPFOF"), ¶ 1.[1] Poor Paul's Place was, among other things, a mink farm. *Id.*, ¶ 2. UVI is a manufacturer of animal vaccines. *Id.*, ¶ 3. Cooper claims that a defective vaccine manufactured by UVI— "Biocom–DP"—failed to protect the mink herd at Poor Paul's Place from an outbreak of canine distemper in 1995, with significant consequences for the size of the herd and the quality of the pelts produced. Specifically, Cooper seeks to hold UVI liable for breach of express warranty (Count I), breach of implied warranty (Count II), negligence (Count III), strict liability (Count IV) and non-compliance with federal regulations governing animal vaccines (Count V).

Before discussing the facts of this case in more detail, it may be helpful to outline briefly the regulatory framework within which manufacturers of animal vaccines must operate. The manufacture and sale of animal vaccines are extensively regulated by the federal government pursuant to the Viruses, Serums, Toxins, Antitoxins and Analogous Products Act, 21 U.S.C. § 151 *et seq.* ("VSTAA" or "the Act"). The Act requires that animal vaccines manufactured in the United States and the establishments that manufacture them be licensed by the United States Department of Agriculture ("USDA"). 21 U.S.C. § 154. Additionally, the Act confers upon the Secretary of Agriculture the authority:

> to make and promulgate from time to time such rules and regulations as may be necessary to prevent the preparation, sale, barter, exchange or shipment ... of any worthless, contaminated, dangerous, or harmful virus, serum toxin, or analogous product for use in the treatment of domestic animals ....

*Id.* Pursuant to this grant of authority, the USDA, through the Animal and Plant Health Inspection Service ("APHIS"), has promulgated a comprehensive set of regulations governing the licensing of animal vaccines and vaccine manufacturers, and setting forth the mechanism for APHIS approval of animal vaccines prior to sale. *See* 9 C.F.R. §§ 101–124.

Before producing an animal vaccine, the manufacturer must submit to APHIS a detailed "Outline of Production" specifying how the proposed vaccine will be formulated and tested. 9 C.F.R. 114.8–9. After receiving a license, but before any particular "serial" (or "batch") of the vaccine may be sold, the manufacturer must test the product in compliance with APHIS rules and regulations and submit to APHIS (1) copies of the test results, (2) a sample of the serial so tested, and (3) any container labels, carton labels, product inserts, circulars or leaflets that will accompany the product. 9 C.F.R. §§ 112.1, 113.3, 113.5, 113.25–55, 113.64–332. "Form 2008" is used to request APHIS approval of a serial. DPFOF, ¶¶ 17–18.

The UVI vaccine at issue in this case, Biocom–DP, is meant to combat canine

---

1. Unless otherwise indicated, a citation to the DPFOF is to an undisputed paragraph within the DPFOF.

distemper, which is an infectious disease (a virus) that afflicts not only dogs, as the name suggests, but also foxes, skunks, raccoons, ferrets and mink. Affidavit of William Wustenberg, D.V.M., Technical Report ("Wustenberg Report"), p. 1. On a commercial mink ranch, the disease has the potential to spread, through animal-to-animal contact or human handling, resulting in premature deaths and a diminution in the size of the herd. *Id.* Additionally, it is not unusual for an afflicted animal to lose its fur as the disease progresses, thus affecting the quality of its pelt. *Id.* For all of these reasons, mink ranchers routinely innoculate young mink kits with distemper vaccine, which is basically a weakened form of the distemper virus.

In 1989, UVI received a license from the USDA authorizing the production, packaging and sale of Biocom–DP. Affidavit of Roger G. Brady ("Brady Aff."), ¶ 4 & Exhibit 1. Biocom–DP consists of two component parts, a freeze-dried distemper vaccine called "Distemink" and a liquid dilutant known as "Biocom–P." *Id.,* ¶ 2. When it is time for mink to be vaccinated, the two components are mixed together and then administered to the animal. *Id.,* ¶ 3.

It is undisputed that in late June of 1995, APHIS approved the Forms 2008 that had been submitted by UVI for serial 28506N (a batch of Biocom–P) and for serial 30534 (a batch of Distemink). DPFOF, ¶¶ 17–18. The packaging, labels, inserts and instructions shipped with the vaccine were likewise approved by APHIS. Brady Aff., ¶ 9. These materials explain that the vaccine "aids in preventing" various diseases, including distemper, when used in "healthy, susceptible mink." *Id.* As discussed in greater detail below, UVI maintains that each of the serials submitted for APHIS approval was "thoroughly tested in accord with all applicable APHIS regulations," while Cooper attempts to construct an argument that proper testing

was not performed. DPFOF, ¶¶ 19–20 (disputed). At any rate, some seven thousand doses of Biocom–DP, produced from these two serials, were shipped to Poor Paul's Place on July 10, 1995. *Id.,* ¶ 21.[2] According to the allegations of the Amended Complaint, the vaccine was administered, in accordance with UVI's directions, to young kits between July 18, 1995 and July 22, 1995. Amended Complaint, ¶ 8. Some 750 doses of unmixed vaccine were left over. DPFOF, ¶ 23.

In September of 1995, the mink kits on the Cooper farm began to exhibit symptoms of canine distemper. *Id.,* ¶ 22; Amended Complaint, ¶ 9. Eventually, according to the plaintiff, the outbreak of distemper resulted in 2,450 mink deaths and pelts that were, because of the disease, "smaller, of lesser quality and texture; and . . . of inferior color." Amended Complaint, ¶¶ 11–12. According to Cooper, the mink who survived could not be used as breeding stock for several years following the outbreak. *Id.,* ¶ 13. All of this, the plaintiff maintains, resulted in the loss of a once "excellent" and "international" reputation within the mink industry. *Id.,* ¶¶ 6, 14.

During the Fall of 1995, Paul Cooper, now deceased, requested that APHIS review its approval of the Biocom–DP serials shipped to his ranch. DPFOF, ¶ 24. Cooper forwarded herd records and some of the leftover vaccine to APHIS. DPFOF, ¶ 24. In response, Dr. David E. Sterling wrote to Cooper, saying:

I have reviewed the reaction history and test results of this product. There are no other reports similar to your observed situation on file at the Veterinary Biologics Field Operations (VBFO). Furthermore, *the serial was tested satisfactory for purity and safety before marketing.*

Brady Aff., Exhibit 11 (emphasis added). Dr. Sterling went on to suggest an expla-

---

**2.** Poor Paul's Place had purchased and used animal vaccines from UVI prior to the 1995 season, including Biocom–DP. Amended Complaint, ¶ 7.

nation for the outbreak *other than* defective vaccine:

> [I]nformation suggested the whelping numbers at your ranch to be approximately 11,000 in 1995. However, only 7,000 kits were vaccinated in July. This reduction in numbers might point to *possible preexisting problems in the kits vaccinated* . . . . With the information at hand, I am unable to determine a definite relationship between the product's performance and the situation you observed.

*Id.* (emphasis added).[3]

In the Fall of 1997, shortly before the expiration date for the remaining vaccine in the plaintiff's possession, the plaintiff's expert, Dr. Wustenberg, sent all of the leftover vaccine to a laboratory for testing. Brief in Opposition to Defendant's Motion for Sanctions, pp. 9–10. This occurred approximately a year before suit was filed, without notice to the defendant. Plaintiff admits that "the method used for the testing was inappropriate and that as a result it is impossible to make any judgment one way or another as to whether or not the tested materials were efficacious or not." *Id.*

On November 16, 1998, Cooper filed a complaint in the Circuit Court for Waukesha County against UVI and its liability carrier, The Home Insurance Company ("Home"),[4] alleging breach of express warranty, breach of implied warranty, negligence and strict liability. An amended complaint, filed June 17, 1999, added a claim for "non-compliance with USDA regulations." Cooper's lawsuit was subsequently removed to this Court pursuant to 28 U.S.C. § 1441.

**ANALYSIS**

**I. Summary Judgment Standard**

The standards governing motions for summary judgment are well established. Pursuant to Rule 56(c):

> summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)(citing Fed.R.Civ.P. 56(c)).

"Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Id.,* at 327, 106 S.Ct. 2548. Summary judgment "can be a tool of great utility in removing factually insubstantial cases from crowded dockets, freeing courts' trial time for those that really do raise genuine issues of material fact." *United Food and Commercial Workers Union Local No. 88 v. Middendorf Meat Co.,* 794 F.Supp. 328, 330 (E.D.Mo.1992). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an oth-

---

**3.** In actuality, some 12,100 kits were born on the ranch in 1995, such that, even if all 7,000 doses of vaccine were administered, the size of the herd had decreased by 5,100 or 42% before any of the Biocom–DP in question was administered. DPFOF, ¶ 26 (admitted in relevant part); Plaintiff's Responses to Defendant's First Set of Written Interrogatories (No. 4). Compared with losses for the years

1992–94, as measured by the difference between advance orders and doses actually shipped by UVI, the pre-vaccination losses for 1995 were quite substantial. *See* Brady Aff., Exhibit 5.

**4.** Cooper named Home as a defendant pursuant to W.S.A. § 803.04(2).

erwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). While a *material* fact is one that is "outcome determinative under the governing law," *Whetstine v. Gates Rubber Co.,* 895 F.2d 388, 392 (7th Cir. 1990), a *genuine* issue as to that material fact is raised only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

The question whether a material issue of fact is *genuine* necessarily requires "some quantitative determination of sufficiency of the evidence." Childress, *A New Era for Summary Judgments: Recent Shifts at the Supreme Court,* 116 F.R.D. 183, 186 (1987). "Of course, a court still cannot resolve factual disputes that could go to a jury at trial, ... [b]ut no longer need the trial court leave every sufficiency issue for trial or a later directed verdict motion." *Id.* "A district judge faced with [a summary judgment motion] must decide ... whether the state of the evidence is such that, if the case were tried tomorrow, the plaintiff would have a fair chance of obtaining a verdict. If not, the motion should be granted and the case dismissed." *Palucki v. Sears, Roebuck & Co.,* 879 F.2d 1568, 1572–73 (7th Cir.1989) (citations omitted). Thus, a party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "[A] party must produce 'specific facts showing that there remains a genuine issue for trial' and evidence 'significantly probative' as to any [material] fact claimed to be disputed." *Branson v. Price River Coal Co.,* 853 F.2d 768, 771–72 (10th Cir.1988). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505.

## II.   Preemption

### A.   General Principles

Preemption has its basis in the supremacy clause of Article VI of the United States Constitution, which states that "the Laws of the United States ... shall be the supreme Law of the Land; ... any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const., Art. VI, cl. 2. When a federal agency acts within the scope of its congressionally delegated authority to preempt state law, its regulations are the "Law of the Land." *City of New York v. F.C.C.,* 486 U.S. 57, 63–64, 108 S.Ct. 1637, 100 L.Ed.2d 48 (1988). This is so even if the statute does not contain an express authorization to displace state law. *Fidelity Federal Savings & Loan Assoc. v. de la Cuesta,* 458 U.S. 141, 154, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982). Federal regulations can trump "positive enactments" at the state level (*i.e.,* statutes and regulations), but they can also preempt state common law rules. *Id.* at 148–49, 102 S.Ct. 3014; *see also Cipollone v. Liggett Group,* 505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992) ("state regulation can be as effectively exerted through an award of damages as through some form of preventive relief").

### B.   *Lynnbrook Farms*

Several years ago, the Seventh Circuit decided *Lynnbrook Farms v. Smithkline Beecham Corp.,* 79 F.3d 620 (7th Cir.), *cert. denied,* 519 U.S. 867, 117 S.Ct. 178, 136 L.Ed.2d 118 (1996), which remains the leading circuit court decision on the preemptive effect of federal regulations governing animal vaccines. *Lynnbrook Farms* holds that APHIS regulations concerning the safety and efficacy of animal vaccines preempt all common law causes of action that seek to impose requirements different from, or in addition to, the federal standards. *See* Paul LeRoy Crist, *A Legal Virus Attacks Farmers and Ranch-*

ers—*And There Is No Vaccine: APHIS Has Left No Tort Remedies At Common Law,* 1 Drake J. Agric. L. 193 (Winter 1996). The Court in *Lynnbrook Farms* set forth a three-part test for determining whether APHIS regulations preempt state law claims:

First, [the court] must ascertain whether the power to preempt is within the authority delegated to the USDA and APHIS by Congress and is a rational exercise of that authority. If so, [the court] must then ask whether APHIS intended its regulations to preempt state common law claims. Finally, if APHIS did seek to preempt state common law, [the court] considers whether the regulations preempt the specific causes of action[ ] asserted by [the plaintiff].

79 F.3d at 624. On the basis of the VSTAA and its legislative history, the Seventh Circuit found that there was an "unquestionable congressional intent to create national, uniform standards for the preparation and sale of animal vaccines." *Id.* at 625. Impliedly, therefore, Congress granted APHIS the power to preempt state law in furtherance of this goal. *Id.* APHIS responded to this implicit grant of authority by promulgating the various rules and regulations described in the background section of this opinion. *Id.* The *Lynnbrook Farms* court had no difficulty concluding that APHIS, in promulgating these regulations, intended to displace state common law. Indeed, APHIS issued a statement, quoted at length by the Seventh Circuit, which made this intention clear:

[W]here safety, efficacy, purity, and potency of biological products are concerned, it is the agency's intent to occupy the field. This includes, but is not limited to the regulation of labeling. Under VSTA[A], Congress clearly in-

tended that there be national uniformity in the regulation of these products.

\*      \*      \*      \*      \*      \*

APHIS ... does not agree that States should be allowed to add various restrictions ... based upon a need to protect domestic animals or the public health, interests or safety. Any restrictions, other than those which are necessary to address a local disease condition, should be Federally imposed so that they are uniform nationwide.

\*      \*      \*      \*      \*      \*

*States are not free to impose requirements which are different from, or in addition to, those imposed by USDA regarding the safety, efficacy, potency, or purity of a product.* Similarly, labeling requirements which are different from or in addition to those in the regulations under the Act may not be imposed by the States. Such additional or different requirements would thwart the Congressional intent regarding uniform national standards, and would usurp USDA's authority to determine which biologics are pure, safe, potent and efficacious.

57 Fed.Reg. 38758, 38759 (August 27, 1992) (emphasis added) (quoted in *Lynnbrook Farms,* 79 F.3d at 625).[5]

To summarize, the *Lynnbrook Farms* court determined that APHIS "acted rationally, and well within its congressionally delegated discretion, in creating a complex ... scheme governing the safety, efficacy, purity and potency of animal vaccines, and in pronouncing this scheme to be the exclusive law in the area." *Id.* at 625; *see also Murphy v. SmithKline Beecham Animal Health Group,* 898 F.Supp. 811 (D.Kan.1995); *Brandt v. Marshall Animal Clinic,* 540 N.W.2d 870 (Minn.App.1995).

---

5. Of like import is a letter from the Acting Administrator of APHIS dated December 22, 1995, explaining that the intent in promulgating the regulations was "and continues to be, to preempt States from imposing requirements either through statutes, regulations or other means that are different from, or in addition to, those promulgated by USDA regarding the safety, efficacy, potency or purity of a product." 79 F.3d at 629 (quoting letter).

State common law claims are preempted if they are in tension with this regulatory scheme, *i.e.*, if their enforcement would impose different or additional requirements concerning the safety or efficacy of vaccines. *Lynnbrook Farms*, 79 F.3d at 629.

### C. Counts II–IV of Cooper's Complaint Are Preempted

■ In light of the foregoing discussion, this Court need only ask whether the specific causes of action asserted by Cooper are preempted by the APHIS regulations. *Lynnbrook Farms*, 79 F.3d at 624. This task is made somewhat easier because two of Cooper's causes of action, strict liability and breach of implied warranty, were also asserted by the plaintiff in *Lynnbrook Farms*. In *Lynnbrook Farms*, as in this case, the vaccine in question had been approved by APHIS as safe and efficacious. Because the vaccine carried this imprimatur, the Seventh Circuit determined that enforcement of the plaintiff's claims for strict liability and breach of implied warranty would necessarily have imposed standards concerning the safety and effectiveness of the vaccine that were different from or in addition to the APHIS standards. Cooper appears to concede that these causes of action, along with negligence, are simply not available to her under the law of this Circuit. Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment, pp. 6–15. The Court so holds, and enters summary judgment in UVI's favor as to Counts II, III and IV of the Amended Complaint.[6]

### D. Cooper's Breach of Warranty Claim Is Preempted

A fourth cause of action asserted by Cooper, breach of express warranty, was not directly at issue in *Lynnbrook Farms*. Cooper argues that this claim is not preempted, relying upon dictum from the Seventh Circuit's decision in *Mitchell v. Collagen Corp.*, 126 F.3d 902 (7th Cir. 1997), *cert. denied*, 523 U.S. 1020, 118 S.Ct. 1300, 140 L.Ed.2d 467 (1998). In *Mitchell*, which involved the preemptive effect of federal regulations governing medical devices, the court found that the plaintiffs had waived their express warranty claim. *Id.* at 915. Nevertheless, the court opined that because "[a] state judgment based on the breach of an express representation by one of the parties does not *necessarily* interfere with the operation of the [federal regulation] . . . we cannot say that such a cause of action is preempted." *Id.* (emphasis added). This Court can envision a hypothetical breach of warranty claim that would not be preempted because its enforcement would not interfere with the operation of the APHIS regulations. For example, a farmer or rancher might bring suit on the basis of an animal vaccine manufacturer's failure to deliver certain vaccines within an agreed-upon time frame. In such a case, the representations which form the basis for the warranty claim do not concern the safety or efficacy of the animal vaccine—areas that *Lynnbrook Farms* teaches are within the exclusive province of APHIS. However, such hypothetical breach of warranty claims are bound to be the exception rather than the rule. *See* Crist, *A Legal Virus Attacks*, 1 Drake J. Agric. L at 216 (observing that "it is hard to fashion any potential warranty that would not impinge on a preempted aspect of vaccine regulation").

As this Court observed in a case that involved a conflict between federally-approved herbicide labeling and common law causes of action for misrepresentation and deceptive advertising:

> [A] . . . sensible and practical approach focuses the preemption issue upon the

---

6. UVI argues that even if Cooper's tort claims are not preempted, they are barred by the economic loss doctrine. Because the Court finds that Cooper's tort claims are so clearly preempted, the Court need not delve into the controversial subject of the economic loss doctrine. *See, e.g., Rich Prods. Corp. v. Kemutec, Inc.*, 66 F.Supp.2d 937 (E.D.Wis.1999) (appeal pending).

content and language of the representation at issue. That is, if the advertisements at issue make representations that are substantially different from the representations made in the EPA-approved label or packaging, claims based on such representations will not be preempted by [the Federal Insecticide, Fungicide, and Rodenticide Act].

*Kuiper v. American Cyanamid Co.*, 913 F.Supp. 1236, 1244 (E.D.Wis.1996), *aff'd*, 131 F.3d 656 (7th Cir.1997). Here, the representations upon which Cooper would like to sue concern the efficacy of the vaccine. Specifically, Cooper invokes statements allegedly made by UVI representatives regarding the high "field effectiveness" of the vaccine, and argues that Poor Paul's Place relied upon these representations in deciding to purchase Biocom–DP. Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment, p. 14. These representations are not "substantially different" from those set forth in the APHIS-approved labeling and packaging that accompanied Biocom–DP. And, because they concern the efficacy of the vaccine, a jury would have to find that the vaccine was ineffective in order to return a verdict for Cooper. "However, APHIS has already declared the products safe and effective [through the approval process]." *Lynnbrook Farms*, 79 F.3d at 630. Thus, a different standard would be enforced if Cooper prevailed on her express warranty claim. *Id.* For all of these reasons, the Court enters summary judgment in favor of UVI with respect to Count I of the Amended Complaint.

### E. Cooper's "Non–Compliance" Claim

Dictum in Judge Flaum's *Lynnbrook Farms* opinion left the door open for a claim of "non-compliance" like the one asserted by Cooper in Count V of her Amended Complaint. 79 F.3d at 629–30. As Judge Flaum noted, a claim that the

vaccine manufacturer did not comply with APHIS regulations would not impose requirements different from, or in addition to, those imposed by the agency. "Where non-compliance is involved, a common law action could simply serve to impose the standards of APHIS." *Id.* Therefore, such a claim is not preempted. *Id.; see also Mitchell*, 126 F.3d at 909–10 (discussing *Medtronic v. Lohr*, 518 U.S. 470, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996)); *Symens v. SmithkKline Beecham Corp.*, 152 F.3d 1050, 1055 (8th Cir.1998) ("common law claims are not preempted to the extent that they seek relief for alleged violations of the federal substantive standards").[7]

A handful of courts appear to have gone beyond the dictum in *Lynnbrook Farms* to suggest that various common law causes of action may survive preemption even without a specific claim that a particular APHIS regulation has been violated. *See, e.g., Silvey v. Mallinckrodt, Inc.*, 976 S.W.2d 497 (Mo.App.1998); *Gresham v. Boehringer Ingelheim Animal Health, Inc.*, 1996 WL 751126 (N.D.Ga.). These decisions purport to be in harmony with the Supreme Court's disposition of *Medtronic, supra,* which post-dated *Lynnbrook Farms* and concerned the preemptive effect of federal regulations governing medical devices. The courts that have taken this expansive view of APHIS "non-compliance" claims appear to believe that the plurality and concurring opinions in *Medtronic,* taken together, signaled a broad curtailment of preemption doctrine. This Court rejected just such an argument in *Kuiper v. American Cyanamid Co.*, 960 F.Supp. 1378, 1383 (E.D.Wis. 1997). Significantly, also, the Seventh Circuit declined an opportunity to re-visit its decision in *Lynnbrook Farms* in light of *Medtronic.* According to Professor Crist, a critic of the *Lynnbrook Farms* decision:

---

**7.** The Acting Administrator of APHIS opined in 1992 that APHIS "did not intend to preempt common law actions for damages

arising from non-compliance with agency regulatory standards." (cited in *Lynnbrook Farms,* 79 F.3d at 629).

In refusing to stay the mandate or reconsider its opinion in light of [Medtronic], the Seventh Circuit made evident the panel's (and a majority of the active judges') belief that no changes were necessitated by the intervening damper on medical-device preemption. By limiting its holding on noncompliance claims to allegations of actual regulatory violations by the manufacturer, the Seventh Circuit narrowed the claims not preempted to a very limited group. So restricted, the noncompliance 'exception' to preemption is essentially nullified except in those rare instances where known violations exist.

Crist, *A Legal Virus Attacks*, 1 Drake J. Agric. at 221–22 (footnotes omitted). In other words, it is the considered opinion of the Seventh Circuit that the exception to APHIS preemption should not swallow the rule. Thus, while Cooper may sue UVI for "non-compliance," she may do so only if she can point to specific evidence that UVI actually violated an APHIS rule or regulation.[8]

■ The plaintiff fails to survive summary judgment on her non-compliance claim because she has offered only speculative evidence that UVI's testing of the vaccine fell short of APHIS standards. Christina Furseth ("Furseth"), a Quality Control Manager for UVI, avers that she "personally reviewed the bench records reflecting the testing and results" with respect to serials 30534 and 28506N and that she "found the results to be accurate and the tests to have been performed in a manner consistent with UVI's standard operating procedures." Furseth Aff., ¶ 5. According to Furseth, the results "met or exceeded all APHIS regulations." *Id.* Furthermore, while APHIS did not conduct its own testing, it is undisputed that the agency approved the testing that UVI did perform. In fact, given an opportunity to review this approval after the outbreak

occurred, the agency reaffirmed that the vaccine had "tested satisfactory for purity and safety before marketing." Brady Aff., Exhibit 11.

Dr. Wustenberg, the plaintiff's expert, has failed to identify specific aspects of UVI's testing procedure that were inadequate. During his deposition, he conceded that he could point to "nothing specific" in UVI's testing records, Forms 2008, or licensing documents that would suggest non-compliance. Deposition of William Wustenberg, D.V.M. ("Wustenberg Dep."), p. 47. In Wustenberg's technical report, the voluminous UVI test records attached to Furseth's affidavit (some sixty pages, in all) are ignored. Instead, the report reasons backwards from the fact that mink injected with the vaccine contracted canine distemper. Because there was an outbreak of the disease, Wustenberg seems to say, the vaccine must not have been in compliance with APHIS regulations. *Res ipsa loquitur.* Perhaps Wustenberg is forced to argue circumstantially because the botched testing of the leftover vaccine leaves him with few alternatives (see discussion below). Wustenberg's approach might be persuasive (or, at least, sufficiently so to survive summary judgment) if he could convincingly rule out other causes for the outbreak, such as the poor health of the herd prior to vaccination. *See* n. 3 *supra* (summarizing evidence of substantial mink losses pre-vaccination). However, Wustenberg's efforts in this regard are undermined by his candid admission that "the reason for [the vaccine's] lack of efficacy is not completely known at this time." Wustenberg Report, p. 12. In other words, although Wustenberg claims to be certain that the vaccine did not provide an adequate level of protective immunity, he admits that he does not know why. *Id.* In essence, Wustenberg ignores the testing data produced by UVI and speculates that UVI must not have complied with APHIS

---

8. As discussed below, the Court believes that such evidence is lacking. Accordingly, it will leave for another day the question of whether plaintiffs in non-compliance cases must also demonstrate a causal link between the violation and the harm to their livestock.

regulations because, if it had, no canine distemper outbreak would have occurred. Whether or not this speculative testimony is sufficiently reliable to survive scrutiny under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), it most definitely fails to create a genuine issue of material fact requiring a trial. Accordingly, the Court enters summary judgment in UVI's favor with respect to Count V of the Amended Complaint, alleging non-compliance with APHIS regulations.

### III. Plaintiff's *Ex Parte* Destructive Testing of Leftover Vaccine

■■ As an alternative ground for the dismissal of Cooper's claims, the Court finds that the plaintiff has intentionally destroyed evidence crucial to the defense of this matter and that this conduct warrants the sanction of dismissal. A party has a duty to preserve evidence within its control that is essential to a claim or defense in litigation. *Sentry Ins. v. Royal Ins. Co. of America*, 196 Wis.2d 907, 539 N.W.2d 911 (Ct.App.1995). When a party intentionally breaches that duty, the trial court may sanction the offending party. *Id.* The court may even, in the exercise of its discretion, dismiss the case or issue a sanction that is "tantamount to dismissal." *Id.* (citing *Milwaukee Constructors II v. Milwaukee Metropolitan Sewerage District*, 177 Wis.2d 523, 502 N.W.2d 881 (Ct. App.1993)). In an egregious case, the court may impose the sanction of dismissal even if the destruction of the evidence "has not impaired the opposing party's ability to present a claim or defense." *Garfoot v.*

*Fireman's Fund Ins. Co.*, 228 Wis.2d 707, 599 N.W.2d 411 (Wist.App.1999). In short, spoliation of evidence can have very severe consequences, which is only proper because it strikes at the very heart of our judicial system's truth-seeking function. *See* Monte E. Weiss, *Spoliation of Evidence: A New Defense in Products Liability Cases*, 70 Wisconsin Lawyer 18 (May 1997).

In *Sentry, supra*, the trial court dismissed a subrogation action because the plaintiff's expert had engaged in *ex parte* destructive testing of a refrigerator that was the suspected cause of a fire. The testing of the refrigerator (which involved removing various wires and components) and the improper disposal of the refrigerator occurred before the insurer for the refrigerator manufacturer had an opportunity to inspect and test the unit. The Court of Appeals upheld the trial court's dismissal of the case, giving great deference to the trial court's factual determination that the "removal of the component parts [*i.e.*, the destructive testing] was an intentional act that deprived the [refrigerator manufacturer's insurer] of the opportunity to conduct tests essential to its adequate defense of the claim made against it." *Id.* at 916.

■ Here, there is similar evidence of intentional, destructive, *ex parte* testing.[9] Before suit was even filed, and without notice of any kind to the defendant, the plaintiff's expert ordered testing of the sole remaining vaccine in Cooper's possession. Like the removal of the wires and components in the refrigerator at issue in *Sentry*, these tests were "destructive" in the sense that the very act of performing

---

9. There is no firm evidence that the plaintiff intentionally destroyed records concerning the size and health of the 1995 mink herd prior to vaccination. Plaintiff testified that she "thought" her son-in-law threw out some of her papers during a move in 1997. Deposition of Mary E. Cooper ("Cooper Dep."), p. 27. However, the Court finds it odd that such records are incomplete, since apparently the records for all other years are complete. The size and health of the herd prior to vaccination are critical, from the perspective of the defendant, because UVI's vaccine is only warranted to work in healthy animals. As noted previously, the available data concerning mink deaths on the Cooper farm prior to the administration of the Biocom–DP in late July of 1995 strongly suggests that the herd was *not* in good health. *See* n. 3 *supra*.

them precluded further testing. As it turned out, the tests were performed using the wrong growth medium, such that no meaningful results could be obtained. Affidavit of Christopher J. Conrad ("Conrad Aff."), ¶ 11.

The plaintiff attempts to distinguish these facts from those in *Sentry* by arguing that the destroyed vaccine was not really crucial to UVI's defense. Cooper points out that UVI knew the leftover vaccine existed and even declined a specific offer from the plaintiff (in 1995) to "check to see if any [of the leftover vaccine was] good." Deposition of Joseph F. Curlee, Jr., D.V.M. ("Curlee Dep."), Exhibit 24. Cooper also faults UVI for failing, as a matter of standard operating procedure, to retest all vaccine serials "implicated" in distemper outbreaks, using samples that the company is required by law to retain. Brief in Opposition to Defendant's Motion for Sanctions, p. 12; 9 C.F.R. §§ 113.3.[10] These arguments overlook the fact that UVI had no compelling reason to seek testing of either the leftover vaccine or the retained samples until the company was sued by Cooper in the Fall of 1998. The vaccine had, after all, been tested by UVI and approved by APHIS. By the time a complaint was served, the plaintiff's leftover vaccine had been destroyed and any samples retained by the company had passed their expiration date and could not be tested. As the plaintiff's expert admits, a proper, timely test might have exonerated the defendant and forced the plaintiff to "look for other reasons why ... the distemper outbreak occurred." Deposition of William Wustenberg ("Wustenberg Dep."), pp. 121–23. At a minimum, the plaintiff should have informed UVI of its intention to engage in destructive testing, so that UVI could either participate in those tests or conduct its own tests on the retained samples. By running out the clock, by failing to inform the defendant, and by botching the tests that it did perform, Cooper deprived UVI of an opportunity to demonstrate, empirically, that its vaccine met all federal requirements. Cooper should therefore be precluded from arguing that the vaccine failed to comply with APHIS regulations.

NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:

1. UVI's motion for summary judgment is GRANTED and the case is dismissed; or, in the alternative,

2. UVI's motion for sanctions is GRANTED and the case is dismissed.

10. Defendant argues that the serial(s) involved in this case "protected every herd but the Coopers'." Brief In Support of Motion for Sanctions, p. 6. Plaintiff argues that the vaccine was "potentially involved in other outbreaks," such that the retained samples ought to have been tested. Brief In Opposition to Defendant's Motion for Sanctions, p. 11. The evidence is inconclusive, and therefore fails to support the plaintiff's argument. The record reflects that one of these so-called "outbreaks" only involved two or three cases out of several thousand animals. Another "outbreak" was reported but never confirmed with an actual diagnosis. In a third case, as here, a link could not be established between UVI's vaccine and the canine distemper. Brady Dep., pp. 57–64 (and exhibits).