Randy J. BEHRENS and Theresa M. Behrens, d/b/a Behrens' Fur Farm, Plaintiffs,

v.

UNITED VACCINES, INC., A DIVISION OF HARLAN SPRAGUE DAWLEY, INC., Defendant.

No. CIV. 00–459(RLE).

United States District Court, D. Minnesota.

Feb. 22, 2002.

Todd Maurice Johnson, Scott Allen Johnson, Johnson Law Group, Minnetonka, MN, for Plaintiffs.

Robert Lowell McCollum, McCollum Crowley Vehanen Moschet & Miller, Scott Patrick Drawe, Minneapolis, MN, for Defendant.

## MEMORANDUM ORDER

ERICKSON, United States Magistrate Judge.

### I. *Introduction*

This matter came before the undersigned United States Magistrate Judge, pursuant to the consent of the parties, as authorized by Title 18 U.S.C. § 636(c), upon the Motion of the Defendant United Vaccines, Inc., for Summary Judgment. A Hearing on the Motions was conducted on September 12, 2001, at which time, the Plaintiffs, Randy and Theresa Behrens, appeared by Todd M. Johnson, Esq., and the Defendant appeared by Scott P. Drawe, Esq.

For reasons which follow, we grant the Defendant's Motion, except as to the Plaintiffs' express warranty, false representation, and Minnesota Consumer Fraud Act claims, which survive Summary Judgment, in part.

### II. *Factual and Procedural History*

This case arises out of the Plaintiffs' use of the Defendant's vaccine in the operation of their mink ranch. In July of 1998, according to industry custom, the Plaintiffs vaccinated the majority of their mink herd against canine distemper.[1] The Defendant's vaccine, which was administered to the Plaintiffs' mink, was Biocom–DP, a "four-way mink vaccine" that "consists of two separate vaccine products." *Memorandum of Law of Defendant United Vaccines, Inc. In Support of Motion for Summary Judgment* ("Defendant's Brief") at 2. One part of the vaccine employs Distem-ink, which is a live virus "protection against distemper," and which is prepared in biscuit form. *Id.* The Distemink is dissolved in the second vaccine—Biocom–P—which is a "liquid inactivated vaccine for protection against enteritis, botulism and pseudomonas." *Id.* at 2. Since the Defendant's formulation combines an inactivated virus with a live virus, measures must be taken to ensure that the Formalin,[2] which is used to inactivate the virus in Biocom–P, is neutralized, so that it does not inactivate the live virus in the Distemink. *Id.* at 7. Each batch of both vaccines is given a serial number and, at issue in this case, is Biocom–P batch PB13, which was sold to the Plaintiffs, as part of Biocom–DP serials DB19/PB13 and DB04/PB13. See, *Affidavit of Roger G. Brady.*

The Plaintiffs vaccinated their mink with the Biocom–DP from lot PB13 in July of 1998. See, *Affidavit of Randy Behrens* at 3. However, the Plaintiffs' ranch suffered a canine distemper outbreak which, ultimately, caused the Plaintiffs to lose 7,100 kits, and 850 breeder females, out of their total of 16,000 mink. *Exhibit B attached to Affidavit of William Wustenberg,* at 5. Due to this substantial loss, the Plaintiffs had to "pelt" their remaining herd, and cease the operation of their business in the Fall of 1999. *Affidavit of Randy Behrens* at 3.

All animal biotics, such as the vaccine at issue here, are regulated by the Federal Government under the Viruses, Serums, Toxin, and Analogous Products Act

---

1. "Canine distemper is an infectious disease dangerous to dogs, foxes, skunks, raccoons, ferrets and mink" that is "spread on mink farms by areosolization of infected excretions from the nasal and oral cavities of the animals." *Affidavit of William Wustenberg* at 1–2. Distemper outbreaks "can result in mortality as high as 50% or higher, depending upon how rapidly the disease spreads, and how quickly it is detected." *Id.* at 2.

2. Formalin is a "formaldehyde solution." *Dorland's Illustrated Medical Dictionary,* 701 (29th Ed.2000). In preparing the Biocom–DP, the Defendant "uses a Formalin compound to inactivate or kill the live components in BIOCOM–P." *Memorandum of Law of Defendant United Vaccines, Inc. in Support of Motion for Summary Judgment,* ("Defendant's Brief") at 7.

("VSTA"), Title 21 U.S.C. §§ 151–159. Under VSTA, all vaccine products, and manufacturing sites, must be licensed by the United States Department of Agriculture ("USDA"). *Title 21 U.S.C. § 154.* VSTA authorizes the Secretary of Agriculture to "make and promulgate from time to time such rules and regulations as may be necessary to prevent the preparation, sale, barter, exchange or shipment * * * of any worthless, contaminated, dangerous, or harmful virus, serum, toxin, or analogous product for use in the treatment of domestic animals." *Id.* Through the Animal and Plant Health Inspection Service ("APHIS"), the USDA, at 9 C.F.R. §§ 101–124, has promulgated Regulations which govern the licensing of animal vaccines. A party who seeks to manufacture animal vaccines must have both a valid "Veterinary Biologics Establishment License and at least one" valid "Veterinary Biological Product License." *9 C.F.R. § 102.2(a).*

In order to obtain a Product License from APHIS, a manufacturer must submit an "Outline of Production," which details how the product will be developed and tested, including "test reports and research data sufficient to establish purity, safety, potency, and efficacy of the product." *9 C.F.R. § 102.3(b)(2)(ii).* Once its Outline of Production is approved, a manufacturer is licensed to produce that biotic. *9 C.F.R. § 102.5.* Since the Regulations mandate that "[n]o biological product shall be released prior to the completion of tests prescribed in a filed Outline of Produc-

tion," a manufacturer must test each batch of the biotic prior to its sale. *9 C.F.R. § 113.1—113.5(a).* Manufacturers are required to report only the test results to APHIS, which is accomplished by completing Form 2008, and they are not required to furnish the raw data that was employed to calculate those results. See, *9 C.F.R §§ 112—113.* A manufacturer must also submit samples of each serial, together with all packaging and accompanying inserts. *Id.* APHIS may then grant a license based solely upon the manufacturer's data, it may test the sample itself, or it may request and review the manufacturer's raw data. *9 C.F.R. § 113.6.* Only when APHIS has approved a serial, may the manufacturer sell it.

The Defendant is licensed to manufacture animal biotics, and it was, in 1989, granted a Product License to produce and sell Biocom–DP. *Defendant's Brief* at 5. The Defendant performed a viricidal activity test[3] on serial PB13, as required. For Biocom–P, the viricidal activity test required a comparison of titers[4] of Distemink, which had been dissolved in sterile water, with Distemink which had been dissolved in Biocom–P. *9 C.F.R. § 113 .36(c).* "If the titer of the [Distemink] rehydrated with the [Biocom–P] is more than 0.7 Log below the titer of the [Distemink] rehydrated with sterile purified water, the product is unsatisfactory for use." *9 C.F.R. § 113.36(d).* When a test proves a product to be unsatisfactory, the Regulations allow for "one retest to rule out faulty techniques." *9 C.F.R. § 113.35(e).*

---

3. APHIS requires that the component parts of Biocom–DP "be tested to insure that, in combination, they were not 'viricidal'" in other words, to insure "that the killed component of the vaccine would [not] destroy or unacceptably damage the live portion of the vaccine." *Plaintiff's Memorandum in Opposition to Motion for Summary Judgment* ("Plaintiff's Brief") at 9, (citing *Affidavit of William Wustenberg*).

4. A titer is "the quantity of a substance required to produce a reaction with a given volume of another substance, or the amount of one substance required to correspond with a given amount of another substance." *Dorland's Illustrated Medical Dictionary,* 1845 (29th Ed.2000). Here, the titers are quantified in terms of Logs.

When the Defendant tested PB13, the titer of the Distemink, which had been dissolved in sterile water, was 3.3 Logs, and when dissolved in Biocom–P it was 3.5 Logs, or .2 Logs greater—a result that the Defendant reported, on its Form 2008, as being "not viricidal." *Defendant's Brief* at 7–8. APHIS received the Form on June 29, 1998, and issued a conditional license,[5] "releas[ing] Biocom–P, serial number PB13 for sale." *Affidavit of Christina Furseth*, at unnumbered 3. Pursuant to a telephone order, which was also placed on June 29, 1998, the Plaintiffs were shipped 16,000 doses of Biocom–DP containing serial PB13. See, *Exhibit C attached to Affidavit of Roger G. Brady.*

On January 6, 2000, after receiving complaints from several mink farmers, see *Exhibit J*, attached to *Affidavit of Todd M. Johnson*, the USDA directed the Defendant to "[i]mmediately stop distribution and sale" of PB13, and it quarantined the remaining inventory of any product containing that serial. *Exhibit K*, at TH01364, attached to *Affidavit of Todd M. Johnson.* In its letter to the Defendant, the USDA explained, that the viricidal activity test results "should have been reported on APHIS Form 2008 as 'NO TEST' and repeated." *Id.* Thus, the Plaintiffs maintain that by reporting the vaccine as being non-viricidal when, in fact, it should have reported a "No test," the Defendant "presented false information in the process of obtaining conditional approval to sell its product" and, therefore, unlawfully sold its product to the Plaintiffs. *Plaintiffs' Memorandum in Opposition to Motion for Summary Judgment* ("Plaintiffs' Brief") at 2 and 10–13; see also, 9 C.F.R. § 113.5(d) ("When the initial or any subsequent test is declared a 'No test,' the reasons shall be reported in the test record, the results shall not be considered as final, and the test may be repeated.") After ordering the Defendant to stop distribution and sales of the PB13, the USDA attempted to correlate the Defendant's test results in its own lab. *Id.* at 17; see also *Exhibit C*, at 36, attached to *Affidavit of Todd M. Johnson* To this date, the USDA has never re-released PB13 for sale. *Id.* at 2–3.

The Plaintiffs filed this diversity action against the Defendant, claiming a breach of express warranties, a breach of implied warranties, strict liability, negligence, false representations, and a violation of Minnesota's Consumer Fraud Act. The Plaintiffs have alleged a loss in excess of one million dollars, which they attribute to the failure of the Defendant's distemper vaccine. In response, the Defendant has filed a Motion for Summary Judgment, which claims that the Plaintiffs' State law claims are preempted by Federal law.

## III. *Discussion*

Summary Judgment is not an acceptable means of resolving triable issues, nor is it a disfavored procedural shortcut when there are no issues which require the unique proficiencies of a Jury in weighing the evidence, and in rendering credibility determinations. See, *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary Judgment is appropriate when we have viewed the facts, and the inferences drawn from those facts, in a light most favorable to the non-moving party, and we have found no triable issue. See, *Duffy v. McPhillips*, 276

---

**5.** "In order to meet an emergency condition, limited market, local situation, or other special circumstance * * * the Administrator may * * * issue a conditional * * * License to an establishment under an expedited procedure which assures purity and safety, and a reasonable expectation of efficacy," and the "[p]reparation of products under a conditional license shall be in compliance with all applicable regulations and standards." *9 C.F.R. § 102.6.*

F.3d 988, 991 (8th Cir.2002); *Schoolhouse Inc. v. Anderson*, 275 F.3d 726, 728 (8th Cir.2002); *Krentz v. Robertson Fire Protection Dist.*, 228 F.3d 897, 901 (8th Cir. 2000); *Curry v. Crist*, 226 F.3d 974, 977 (8th Cir.2000); *Carter v. St. Louis Univ.*, 167 F.3d 398, 400 (8th Cir.1999). For these purposes, a disputed fact is "material" if it must inevitably be resolved and the resolution will determine the outcome of the case, while a dispute is "genuine" if the evidence is such that a reasonable Jury could return a Verdict for the nonmoving party. See, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Herring v. Canada Life Assurance*, 207 F.3d 1026 (8th Cir. 2000); *Austin v. Minnesota Mining and Manuf. Co.*, 193 F.3d 992, 995 (8th Cir. 1999); *Liebe v. Norton*, 157 F.3d 574, 578 (8th Cir.1998); *Peter v. Wedl*, 155 F.3d 992, 996 (8th Cir.1998).

As Rule 56(e) makes clear, once the moving party files a properly supported Motion, the burden shifts to the nonmoving party to demonstrate the existence of a genuine dispute. In sustaining that burden, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavit or as otherwise provided in this Rule, must set forth specific facts showing that there is a genuine issue for trial." *Rule 56(e), Federal Rules of Civil Procedure;* see also, *Anderson v. Liberty Lobby, Inc.*, *supra* at 256, 106 S.Ct. 2505; *Allen v. Entergy Corp.*, 181 F.3d 902, 904 (8th Cir.1999); *Jaurequi v. Carter Manufacturing Co.*, 173 F.3d 1076, 1085 (8th Cir.1999). Moreover, the movant is entitled to Summary Judgment where the nonmoving party has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, supra at 322, 106 S.Ct. 2548; see also, *Hammond v. Northland Counseling Cen-*

*ter, Inc.*, 218 F.3d 886, 891 (8th Cir.2000); *Greer v. Shoop*, 141 F.3d 824, 826 (8th Cir.1998). No genuine issue of fact exists in such a case because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, supra at 323; see also, *Bell Lumber and Pole Co. v. United States Fire Ins. Co.*, 60 F.3d 437, 441 (8th Cir. 1995); *McLaughlin v. Esselte Pendaflex Corp.*, 50 F.3d 507, 510 (8th Cir.1995); *Settle v. Ross*, 992 F.2d 162, 163 (8th Cir. 1993).

As we have noted, the Defendant urges that the Plaintiffs' State law claims are preempted by Federal law. Therefore, although we "give the benefit of all factual inferences to the plaintiff, a finding by the court that the plaintiff's claims are preempted by federal law would entitle the defendant to" Summary Judgment. *Murphy v. SmithKline Beecham Animal Health Group*, 898 F.Supp. 811, 813–14 (D.Kan.1995).

A. *Standard of Review.* The core issue before us is whether the comprehensive Federal regulatory scheme, which has been created by VSTA, preempts the State law claims that have been asserted by the Plaintiffs. The Supremacy Clause of the Constitution directs that "the Laws of the United States * * * shall be the supreme Law of the Land." *United States Constitution, Art. VI.* It is elemental that Federal laws can preempt State laws, and that such preemption can either be express, as when Congress explicitly states an intent to preempt, or implied, "when federal and state laws directly conflict, when state law stands as an obstacle to accomplishing the purposes of federal law, or when federal law is so pervasive that it reflects an intent to occupy a regulatory field." *Symens v. SmithKline Beecham Corp.*, 152 F.3d 1050, 1053 (8th Cir.1998)("*Symens I*"). In addition

to preempting State law by its own act, Congress may also expressly, or impliedly, delegate its authority to preempt State law to a Federal Agency. *City of New York v. F.C.C.*, 486 U.S. 57, 63–64, 108 S.Ct. 1637, 100 L.Ed.2d 48 (1988).

In determining whether APHIS preempts the Plaintiffs' State law claims, we do not face a clean slate, for our analysis is closely guided, if not controlled, by our Court of Appeals' decision in *Symens I*, and its progeny. In *Symens I*, the Court concluded as follows:

> VSTA as construed by APHIS preempts inconsistent substantive state law "requirements" but not state common law remedies. In this situation, common law claims are **not preempted to the extent that** they seek relief for alleged violations of the federal substantive standards.
>
> \*     \*     \*     \*     \*   .   \*
>
> Plaintiffs' broadly pleaded claims are preempted to the extent that they rely upon "liability-creating-premises" that are different from, or in addition to, those imposed by USDA regarding the safety, efficacy, potency, purity, or labeling of [defendant's] licensed vaccines.

*Symens I,* supra at 1055–56.

Since the Court could not determine, on the Record presented on appeal, whether the plaintiffs' claims, in *Symens I,* fell within the preemptive scope of VSTA, the Court remanded the matter to the District Court for " 'a careful comparison between the allegedly pre-empting federal requirement and the allegedly pre-empted state requirement to determine whether [the plaintiffs' claims] f[e]ll within the intended pre-emptive scope' of the federal regime." *Symens I,* supra at 1056, quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 500, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996).

Upon remand, the District Court determined that the plaintiffs' state law claims for strict liability, for implied warranties of fitness for a particular purpose, and for merchantability, for false advertising, and for failure to warn, were preempted by VSTA, as they would impose standards upon the defendant that were different from, or in addition to, the substantive Federal standards, while the plaintiffs' claim for "fraud upon the agency" was not preempted, as it relied upon the defendant's purported violation of the APHIS regulations, but it was unsupported by sufficient facts to sustain a Jury's Verdict. See, *Symens v. SmithKline Beecham Corp.*, Civ. No. 94–1036 (D.S.D., September 30, 1999)[attached to Defendant's Reply Brief]. On subsequent appeal, the District Court's rulings were affirmed in their entirety. *Symens v. SmithKline Beecham Corp.*, 2001 WL 263058 at \*1, 7 Fed.Appx. 534 (8th Cir.2001)(*Symens II* ).

Given the holdings in *Symens I and Symens II,* our Circuit has joined the Court of Appeals for the Seventh Circuit, three District Courts, and the Minnesota Court of Appeals, in extending the preemptive effect of VSTA to all State law claims which impose requirements different from, or in addition to, the requirements of the regulations that have been duly promulgated by APHIS. See, *Lynnbrook Farms v. Smithkline Beecham Corp.*, 79 F.3d 620 (7th Cir.1996), cert. denied, 519 U.S. 867, 117 S.Ct. 178, 136 L.Ed.2d 118 (1996); *Cooper v. United Vaccines, Inc.*, 117 F.Supp.2d 864 (E.D.Wis. 2000); *Garrelts v. SmithKline Beecham Corp.*, 943 F.Supp. 1023 (N.D.Iowa 1996), *Murphy v. SmithKline Beecham Animal Health Group*, 898 F.Supp. 811 (D.Kan. 1995); *Brandt v. Marshall Animal Clinic*, 540 N.W.2d 870 (Minn.App.1995), rev. denied (Minn., February 9, 1996).[6] The

---

**6.** We do note, as the Court did in *Garrelts v. SmithKline Beecham Corp.,* 943 F.Supp. 1023, 1029 n. 2 (N.D.Iowa 1996), that the Court denied a Motion for Summary Judgment

Plaintiffs argue, however, that the doctrine of estoppel should preclude the Defendant's reliance upon preemption. We cannot agree.

■ According to the Plaintiffs, the Defendant should be estopped from asserting a preemption defense, because it was the Defendant's own misrepresentations that resulted in its product being approved by APHIS. *Plaintiffs' Brief* at 27–29. In support of this argument, the Plaintiffs cites *National Bank of Commerce v. Dow Chemical Co.*, 165 F.3d 602 (8th Cir.1999), and contend that, there, the Eighth Circuit rejected the plaintiff's estoppel claim "only because there was insufficient evidence to support such a claim." *Plaintiffs' Brief,* at p. 28. The Plaintiffs' reading of *National Bank* is plainly misguided for, in that case, the Court was concerned with the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), and the Court specifically stated that it "express[ed] no view concerning whether a defendant may be estopped from claiming FIFRA preemption when material has been withheld from the EPA in the registration process." *Id.* at 609 n. 10.

We have found no decision, and the Plaintiffs have drawn none to our attention, that has applied their claimed estoppel argument to APHIS preemption. Moreover, we are troubled by the Plaintiffs' repeated disclaimer of any intent to rely upon a "fraud-on-the-agency" argument—because they pled no such claim—while asserting the same genre of "false reporting," which is invoked in a "fraud-on-the-agency" action. See, *Plaintiffs' Brief,* at p. 5. More importantly, we find an estoppel argument unavailing, for the same reasons that we have concluded, and

shall subsequently explain, that certain of the Plaintiffs' other claims are foreclosed by preemption, since the application of that doctrine would impose standards different from, or in addition to, those contained in VSTA, and in APHIS's regulations. See, *Footnote 11, infra.* In this respect, we agree with the Court in *Reutzel v. Spartan Chemical Co.*, 903 F.Supp. 1272, 1284 (N.D.Iowa 1995), where the Court rejected such an estoppel argument in the context of FIFRA, reasoning as follows:

> The court concludes that by enacting FIFRA, Congress determined that the FDA, and not the judiciary, has the task of insuring that insecticides, fungicides, and rodentcides [sic], are in compliance with the requirements of FIFRA. Were the court to decide that an allegation of failure to comply with agency requirements would save all state tort claims against insecticides, fungicides, and rodentcides [sic], then the provisions of FIFRA and Congressional intent would be rendered a nullity. Such a conclusion would circumvent the preemptive effect of section 136v, and Congress' intent to protect manufacturers of such materials would be severely undermined. Therefore, the court concludes that the doctrine of estoppel does not prevent Spartan Chemical from asserting FIFRA preemption.

Substituting, as appropriate, "VSTA," "APHIS," and "virus, serum, toxin, or analogous product," for "FIFRA," "FDA," and "insecticides, fungicides, and rodenticides," we find the foregoing observation apposite to the estoppel claim that the Plaintiffs seek to raise here. To the extent that *Roberson v. E.I. Dupont De*

---

without prejudice, on preemption grounds, in *Stegmaier v. SmithKline Beecham Animal Health, Inc.*, Civ. No. 4–95–149, 1996 WL 755721 at *1 (D.Minn., August 22, 1996), but that ruling was not on the merits, and the

case appears to have arisen from a "farmer's accidental self-injection of swine vaccine * * *," and not from an alleged harm to nonhumans by virtue of an animal vaccine regulated by APHIS.

*Nemours & Co.,* 863 F.Supp. 929, 932–33 (W.D.Ark.1994), and *Hurley v. Lederle Lab. Div. of Am. Cyanamid,* 863 F.2d 1173, 1179–80 (5th Cir.1988), suggest a different result, we reject their analyses for reasons expressed by the Court, in *Reutzel.* See, *Reutzel v. Spartan Chemical Co.,* supra at 1283–84. Accordingly, we examine the Plaintiffs' causes of action, which have been pled here, with the *Symens* standard as the focus of our review.

The Plaintiffs contend that the Defendant cannot be protected from their claims by the preemption doctrine because, by "present[ing] false information in the process of obtaining conditional approval to sell its product," which resulted in APHIS "order[ing] the exact serials of the product sold to plaintiffs to be withdrawn from the marketplace," the Defendant never actually had APHIS's approval to sell the vaccine. *Plaintiffs Brief* at 2. The Plaintiffs urge that, because "[i]t is unlawful," under *9 C.F.R. § 113.5,* "for a manufacturer to release an animal vaccine before completion of all testing required by the APHIS for that specific vaccine," and because the Defendant obtained its license to market Biocom–DP on the basis of a "No test" which, under *9 C.F.R. § 113.5(d)* "is not considered a valid test for the purposes of approval of a product for sale," the Defendant violated a substantive APHIS standard when it sold PB13 serial to the Plaintiffs. The Plaintiffs identify no other substantive requirement of VSTA, or of APHIS's regulations, as having been violated by the Defendant's marketing of Biocom–DP, which contained PB13. The Defendant counters that, even if its testing of PB13 should have been reported as a "No test," the APHIS regulations merely required a retest, which the Defendant conducted, in January, and again in April of 2000, obtaining results which demonstrated, to APHIS's satisfaction, that PB13 was not viricidal. As a result, the Defendant

claims that it is protected from the Plaintiffs' State law claims by the doctrine of preemption, as it has satisfied all of the substantive requirements of APHIS's regulations.

In part, the Defendant urges that we apply a broader sweep of preemption than expressed in *Symens I and Symens II,* based on the Supreme Court's recent decision in *Buckman Co. v. Plaintiffs' Legal Comm.,* 531 U.S. 341, 121 S.Ct. 1012, 148 L.Ed.2d 854 (2001), where the Court extended implied preemption, under the Federal Food, Drug, and Cosmetic Act ("FDCA"), as amended by the Medical Device Amendments of 1976, Title 21 U.S.C. § 301, to preclude State law claims in the nature of a "fraud-on-the-agency" cause of action. In *Buckman,* the plaintiff alleged, as a sole cause of action, that the defendant, who served as a regulatory consultant to a medical device manufacturer, made fraudulent mis-representations to the Food and Drug Administration ("FDA"), in order to secure clearance to market the manufacturer's medical device. There, the plaintiffs employed a "but for" argument: "Had the representations not been made, the FDA would not have approved the devices, and plaintiffs would not have been injured." *Id.* at 343, 121 S.Ct. 1012.

In rejecting that argument, and in extending implied preemption, so as to preclude such a claim, the Court first noted that a "fraud-on-the-agency" claim is uniquely Federal, where the agency is a part of the Federal Government, and "is hardly 'a field which the States have traditionally occupied,' such as to warrant a presumption against finding federal preemption of a state-law cause of action." *Id.* at 347, 121 S.Ct. 1012. The Court went on to note the substantial power afforded to the FDA so as to police for such fraud, and the flexibility that the agency was

empowered to exercise in addressing the critical needs of the medical device market. The Court reasoned that fraud-on-the-agency claims could discourage potential applicants from seeking licensure for medical devices if "complying with the FDA's detailed regulatory regime" would cast the applicants in "the shadow of 50 States' tort regimes." *Id.* at 349, 121 S.Ct. 1012. As the Court reasoned:

Conversely, fraud-on-the-FDA claims would also cause applicants to fear that their disclosures to the FDA, although deemed appropriate by the Agency, will later be judged insufficient in state court. Applicants would then have an incentive to submit a deluge of information that the Agency neither wants nor needs, resulting in additional burdens on the FDA's evaluation of an application. As a result, the comparatively speedy § 510(d) process could encounter delays, which would, in turn, impede competition among predicate devices and delay health care professionals' ability to prescribe appropriate off-label uses.

*Id.* at 351, 121 S.Ct. 1012.

Here, the Defendant characterizes the Plaintiffs' contention, that the Defendant failed to record test results as a "No test," as a variant of a purported fraud-on-the-agency claim, which is preempted by VSTA, under the rule expressed in *Buckman.*

Of course, the simplest response to this assertion is that the Plaintiffs, here, have failed to allege a "fraud-on-the-agency" claim in their Complaint. See, *Plaintiffs*

*Brief,* at p. 5 ("The ["fraud on the agency"] argument must fail from a clear reading of plaintiffs' complaint—plaintiffs never allege fraud on the agency or non-compliance as an independent claim."). We understand the Defendant's misapprehension, however, as the Plaintiff's argument has suggested some form of duping of APHIS, by the Defendant, but the argument finds no substance in either the allegations of the Plaintiffs' Complaint, nor in the facts presented in this Record. If, as the Defendant perceives, the Plaintiffs are asserting some fraud-on-APHIS, by the Defendant's regulatory disclosures, it is a perception that, upon the Record here presented, APHIS has not joined.[7] More importantly, we read *Buckman* as expressly distinguishing the Supreme Court's prior holding in *Medtronic.* As the Court reasoned:

Notwithstanding the fact that Medtronic did not squarely address the question of implied pre-emption, it is clear that the Medtronic claims arose from the manufacturer's alleged failure to use reasonable care in the production of the product, not solely from the violation of FDCA requirements. * * * In the present case, however, the fraud claims exist solely by virtue of the FDCA disclosure requirements. Thus, although Medtronic can be read to allow certain state-law causes of actions that parallel federal safety requirements, it does not and cannot stand for the proposition

---

**7.** Although APHIS expressed disapproval of the Defendant's report of viricidal test results, in June of 1998, the Record is devoid of any suggestion, let alone a showing, that APHIS regarded the report as a "fraud," a "misrepresentation," or a "false statement." Rather, APHIS appears to take exception to the statistical basis upon which that report of viricidal results was based. One can be guilty of an erroneous, statistical computation—if one

there be—without imputing demonic purposes, and this Record intimates no underhandedness on the Defendant's part. While APHIS withheld PB13 from the marketplace, in January of 2000, there is nothing to suggest, as but one example, that the Defendant's licensure, as a manufacturer of animal biotics, was ever so slightly in jeopardy. If such evidence exists, it is not disclosed in this Record.

that any violation of the FDCA will support a state-law claim.

*Id.* at 352–53, 121 S.Ct. 1012.

Notably, the Supreme Court's holding in *Medtronic* was expressly considered by our Court of Appeals in *Symens I,* and did not deter the Court from concluding that "broadly pleaded claims are pre-empted[, under VSTA as construed by APHIS,] to the extent that they rely upon 'liability-creating-premises' that are different from, or in addition to, those imposed by USDA regarding the safety, efficacy, potency, purity, or labeling of [APHIS] licensed vaccines." *Symens I,* supra at 1055, 1056. As a consequence, we find nothing in *Buckman* which alters the holdings in *Symens I and Symens II,* at least on the Record presented here.

B. *Legal Analysis.* Since they involve distinct analytical considerations, we separately address the Plaintiffs' causes of action for strict liability, for negligence, and for a breach of implied warranties, from their causes of action for a breach of express warranties, false representation, and for a claimed violation of the Minnesota Consumer Fraud Act.

1. *The Plaintiffs' Claims for Strict Liability, for Negligence, and for a Breach of Implied Warranties.*

As we have briefly recounted, on June 26, 1998, the Defendant submitted to APHIS, on Form 2008, the results of the viricidal activity test, which had been performed on serial PB13, in order to secure permission for the release of that serial to the public. See, *Exhibit F, attached to Affidavit of Todd M. Johnson,* at Bates stamped Th00113–115. Solely on the basis of the results disclosed on that Form 2008, APHIS authorized the release of the PB13 serial on June 28, 1998. Although APHIS was empowered to do so, in conjunction with its consideration of the safety, efficacy, potency, purity, or labeling of that serial, APHIS did not request copies of the Defendant's Bench Records which related to that viricidal activity test, nor did it elect to defer a decision on the release of that serial until APHIS had secured confirming test results.

It was not until December of 1999, or January of 2000—about a year and one-half after APHIS had approved the release of PB13—that the Defendant heard anything further from APHIS as to that serial. At that time, APHIS requested copies of the Bench Records that pertained to serial PB13. In a letter dated January 6, 2000, a representative of APHIS confirmed an earlier telephone call, on that same date, in which the Defendant was directed to "immediately stop distribution and sale of BP13, and to quarantine any remaining inventory." See, *Exhibit K* attached to *Affidavit of Todd M. Johnson,* at Bates No. TH01364. The letter explained further, as follows:

> This notification is based on a review by the Center for Veterinary Biologics (CVB) of your bench records. The records are deficient in determining the Viricidal Activity (VA) of these serials. See attached memo by Dr. James Tanner, Chief Statistician, CVB.
>
> The VA results should have been reported on the APHIS Form 2008 as "NO TEST" and repeated. Since this did not occur the products containing these serials should not have been shipped before valid testing was completed. These serials were not Eligible For Release as reported on the APHIS Form 2008.

In his attached memorandum, Dr. Tanner stated as follows:

> The 50% infective dose ($ID_{50}$) values reported by the firm are correctly calculated by the Reed–Muench (RM) procedure. However, only one (Ref DA62 5/12/98) of the four assays resulted in a response in which the $ID_{50}$ can be meaningfully estimated by this method. The

RM method is a procedure for interpolating between points and should not be used with data that do not encompass a 50% response. It is probably prudent to use only data that include the 50% response level regardless of the method of calculation, although there are procedures that can be used to exstapolate [sic] beyond the observed response based on fitting a distribution to the observed data.

*Id.* at Bates No. TH01366.

No where did either APHIS, or Dr. Tanner, identify any requirement, either in the Defendant's Outline of Production, or in the governing APHIS regulations, where the assay results, that had been submitted by the Defendant a year and one-half before, failed to comply with a published APHIS requirement. Rather, APHIS—through Dr. Tanner—expressed the view that a different calculation would be "probably prudent," but he did not so much as cite any particular treatise, text, or regulation, for that view.

Nonetheless, the Plaintiffs claim that, having failed to report the viricidal test results, in June of 1998, as a "NO TEST," the Defendant breached APHIS substantive standards. In further support for that view, the Plaintiffs offer the opinion evidence of Dr. T. Michael Schwartz, who holds a doctorate in Veterinary Medicine. In a report dated March 28, 2001, Dr. Schwartz expressed his opinion that, "[b]ased on the applicable industry and scientific standards, the data set forth in th[e] June 22, 1998 bench record should have been reported as a 'no test.'" See, *Exhibit* F attached to *Affidavit of Todd M. Johnson,* at 2. Later, in the same report, Dr. Schwartz opines as follows:

> In reviewing the deposition testimony of Christina Furseth of United Vaccines, I realize she suggests that in 1998 there was no requirement to have greater than 50% positive and have less than

50% positive results among the test dilution results to make a valid calculation. While that may have then been the perceptions of Ms. Furseth and other United Vaccines personnel, such understanding was incorrect under industry and scientific standards. Attached is a copy of the original Reed–Muench article, published in 1938 but still regularly relied upon, which ordained the protocol for conducting these tests. You will note that the title of the article is "A Simple Method of Estimating 50% Endpoints." Based upon scientific and industry standards continuously applicable when ever the Reed–Muench test is used, including June of 1998, the failure to obtain a greater than 50% positive at any dilution required the test to be classified a "no test."

*Id.* at 3.

In addition, the Plaintiffs offer the opinion of Dr. William Wustenberg, who also holds a doctorate in Veterinary Medicine. In his affidavit, Dr. Wustenberg also states that:

> As reflected in the Reed–Muench article, and as understood industry-wide, before the Reed–Muench calculations can be properly applied to underlying laboratory data it is essential that a sufficient percentage of the egg embryos utilized as the growth medium survive the process to allow the researcher to extrapolate from the data. Moreover, Reed–Muench calculations require that data be generated on either side of a "50% endpoint" before the Reed–Muench calculations can generate any useful data for determining whether the product was or was not viricidal.

*Affidavit of William Wustenberg, DVM,* at pp. 4–5.

However, absent from the opinions of both doctors is the slightest suggestion that APHIS required Reed–Muench computations to be calculated only on test results

showing over 50% positive, and less than 50% positive, reactions. Instead, during the course of his deposition, which was taken on June 5, 2001, Dr. Schwartz testified as follows:

Q. * * * Is there anything in the USDA standards which provides for the manner in which the virus titers are to be calculated?

A. The exact methodology?

Q. Correct.

A. Nothing that I can remember in the one for the viricidal test.

Q. Is there anywhere in the USDA standards which provides for the manner in which the Reed–Muench calculation is to be performed?

A. Not that I'm aware of.

*Deposition of Dr. T. Michael Schwartz, attached to the Affidavit of Scott P. Drawe, at pp. 43–44.*

\* \* \* \* \* \*

Q. Did you rely on any documents other than the original Reed–Muench article for your opinion that a—that in excess of 50 percent positives must be found at one dilution before it is a valid test?

A. I know from historically dealing with USDA back as far as the 1970's, when we did seed lot testing of almost every one of our vaccines, that we were told that at that time in order to have a valid test for doing the master seed work was that was a requirement. That would have been about the middle of the 1970's.

Q. Are you aware of any similar statement being made to United Vaccines?

A. No, I'm not.

Q. Is that statement that a number in excess of 50 percent positive at one dilution level is required published anywhere by the USDA?

A. Not that I'm aware of.

*Id.* at pp. 47–48.

\* \* \* \* \* \*

Q. Dr. Schwartz, the only scientific article that you've cited in support of your opinion that at least 50 percent positive results at one dilution level are required for a valid Reed–Muench calculation is the Reed–Muench article itself; is that correct?

A. That's correct.

Q. As you sit here today, are you aware of any other articles or scientific writings that support that opinion?

A. I'm sure that other people have written on that subject, but I'm not aware of those. I'm sure that people have done that.

Q. Have you ever seen any other article than the Reed–Muench article that supports that proposition?

A. No, I have not.

Q. Now, the Reed–Muench article, is there anywhere in the Reed–Muench article that it specifically says that the calculation is not valid in the absence of at least 50 percent positive findings at one dilution?

A. Not that I'm aware of.

*Id.* at 68–69.

Given this state of the Record, we are hard-pressed to conclude that a published standard, or requirement of APHIS, was breached when the Defendant reported the results of the viricidal activity test, on serial PB13, in June of 1998.

Absent from the Record is any showing that the protocol of the operative Outlines of Production, or any publication, or regulation, of APHIS, required that the results of such testing be reported only when a greater than 50 percent positive response was obtained. Apart from Dr. Tanner's view, that it was "probably prudent" that such a computation be based upon a greater than 50% response, even Reed–Muench

expressed no such requirement in their original formulation of the statistical approach. See, Reed, L. and Muench, H., "A Simple Method of Estimating Fifty Per Cent Endpoints," *The American Journal of Hygiene* (Vol.27, No. 3, May, 1938), at *Exhibit F,* at Bates No. 002554—022558, attached to *Affidavit of Todd M. Johnson.*

In addition, we are presented with Dr. Schwartz's historic view that, when he completed such viricidal activity tests in the mid–1970's, APHIS had insisted, at that time, that his results show a greater than 50 percent positive response if they were to be found valid under the Reed–Muench formula. This, however, says nothing about APHIS's requirements, as they existed in June of 1998, nor does it offer more than his conclusory impression, undergirded by *ipse dixit,* that, under "industry and scientific standards, which have been continuously applicable whenever the Reed–Muench test is used, including June of 1998," "the failure to obtain a greater than 50% positive at any dilution required the test to be classified a 'no test.'" *Exhibit F* attached to *Affidavit of Todd M. Johnson,* at 2; see also, *General Electric Co. v. Joiner,* 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997) ("Trained experts commonly extrapolate from existing data," "[b]ut nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert, as [a] court may conclude that there is simply to great an analytical gap between the data and the opinion proffered.").[8]

Nonetheless, we cannot ignore the express observation of an APHIS representative, in January of 2000, that the Defendant's test results, from a year and one-half previously, should have been reported as a "NO TEST." Neither can we exclude the possibility that a greater than 50 percent positive response is as inseparable to Reed–Muench computations, as the mathematical pi is to the computation of the circumference of a circle—rounding off pi to 3.00, for the ease of calculation, just will not do. We have no evidence, one way or the other, on this specific point and, therefore, we find the existence of a genuine issue of material fact which precludes Summary Judgment on this basis.[9] In the absence, however, of an affirmative showing that APHIS published such a requirement, or that the requirement was otherwise disclosed to the Defendant, prior to June of 1998, or was scientifically subsumed in the Reed–Muench analytical framework, as recognized within the industry and APHIS, we could well be persuaded to reconsider Summary Judgment on this point.

■ The Plaintiffs argue that, where, as here, a Jury issue remains as to noncom-

---

8. This same principal applies to the opinion of Dr. Wustenberg, who, like Dr. Schwartz, opines that, under industry standards, data must be generated on either side of a 50% endpoint in order for the data generated under a Reed–Muench calculation to generate useful data. Again, Dr. Wustenberg has provided the Court with no showing of the basis for that opinion. Instead, like Dr. Schwartz, Dr. Wustenberg relies only upon the Reed–Muench article which, upon our reading, and that of Dr. Schwartz, see, *Deposition of Dr. T. Michael Schwartz, attached to the Affidavit of Scott P. Drawe,* at p. 69, contains no such requirement.

9. We have coursed the Record before us, and find no express proof, by the Defendant, that that the industry and scientific standard, under the Reed–Muench paradigm, is not as suggested by Drs. Schwartz, and Wustenberg, although Furseth plainly disagreed with any notion that a 50% positive result was required before an assay could be reported to APHIS as other than a "No test." Accordingly, this aspect of the Record presents a genuine, material issue of fact, that cannot legitimately be resolved upon Summary Judgment.

pliance with an APHIS requirement, the preemption slate is wiped clean, and they are at liberty to present any State law claim, because "where the federal agency decides that a product has failed to meet [the] standards necessary for sale, state law damage claims do no more than establish an additional remedy for the improper sale of the product," a result that, they urge, is allowed under *Medtronics*. However, we are required to make " 'a careful comparison between the allegedly preempting federal requirement and the allegedly pre-empted state requirement to determine whether [the Plaintiffs' claims] fall within the intended preemptive scope of the federal regime." *Symens I*, supra at 1056, quoting *Medtronic, Inc. v. Lohr*, supra at 500, 116 S.Ct. 2240. Under that standard of review, the Plaintiffs' claims, which we here examine, must fall as a matter of preemption.

Since the only substantive requirement, that the Plaintiffs have identified as having been breached, is the failure, in their view and, apparently, in the view of APHIS, to report the viricidal test results as a "NO TEST," that purported failure is the focus of our analysis. Essentially, the Plaintiffs' argument is that "but for" the Defendant's failure to properly disclose a "NO TEST," in June of 1998, the Plaintiffs would not have suffered the losses they now claim. Unfortunately for the Plaintiffs, when rested on such a theory, their claims can only survive if PB13 was other than the Defendants reported on their Form 2008—that is, if it was, in fact, viricidal as determined by the APHIS prescribed test. The Plaintiffs have offered no competent showing that serial PB13, under the regulations of APHIS, or the Defendant's approved Outline of Production, was determined to be viricidal. Indeed, all of the evidence, which responds to the APHIS approved test for viricidal activity, proves to the contrary.

Accepting, as we must for these purposes, that the Defendant should have reported a "NO TEST" in June of 1998, the Defendant was entitled, under the APHIS regulations, to retest the serial. See, *9 C.F.R. § 113.35(e)*. When APHIS raised the "NO TEST" issue to the Defendant's attention, in January of 2000, the Defendant retested the serial at the instance of APHIS and, to the satisfaction of APHIS, demonstrated that the serial was not viricidal. See, *Exhibit L attached to Affidavit of Todd M. Johnson*, at Bates No. TH01109 ("Dr. Tanner has reviewed and is satisfied that both of the retested serials [i.e., those including PB13] meet the validity requirements for conducting the Reed–Munch [sic] calculations of the data."). In addition, the Defendant completed another viricidal activity test in April of 2000, which also demonstrated that the serial was not viricidal. See, *Exhibit H* attached to *Affidavit of Christina Furseth*. Indeed, the Plaintiffs's own expert, Dr. Schwartz, corroborated the nonviricidal results of those retests, agreeing that this conclusion was reached in accordance with the mandates of Reed–Muench. See, *Deposition of Dr. Michael Schwartz*, at 60–67, attached to *Affidavit of Scott Drawe*. Apart from the viricidal testing results, the Plaintiffs have failed to identify any other standard or requirement of VSTA, as interpreted by APHIS, with which the Defendant failed to comply.

Of course, we are mindful of the Plaintiffs' contention, that full compliance with the APHIS standards was not accomplished in June of 1998, when APHIS released PB13 for sale, but the Plaintiffs have failed to sustain their burden of demonstrating any substantive noncompliance—they have failed to demonstrate that, according to APHIS standards and requirements, PB13 was viricidal. We find it telling that, while Dr. Schwartz took

exception to the viricidal test results of June of 1998 having been reported as something other than a "No test," he did not regard those test results as "indicat[ing] that PB13 is viricidal." *Deposition of Dr. Schwartz, attached to Affidavit of Scott Drawe,* at p. 57. Moreover, Dr. Schwartz testified that he was not aware of any testing that was performed, which indicated that PB13 was viricidal. *Id.*

The Plaintiffs underscore, however, that APHIS continued a hold on the release of PB13, notwithstanding the Defendant's submission of the retests, in January and April of 2000, and that, therefore, this demonstrates that any damage, that they have sustained, was attributable to the Defendant's product. Of course, no one can properly question the formidable powers of APHIS, under the regulations that it promulgated, to exercise its administrative authority to "prevent the preparation [and] sale * * * of any worthless, contaminated, dangerous, or harmful virus, serum, toxin, or analogous product for use in the treatment of domestic animals * * *." *Title 21 U.S.C. § 154.* Indeed, a strong argument could be made that, given the outbreaks of distemper, in mink ranches employing the Defendant's vaccine, APHIS was persuaded, by January of 2000, that the Defendant's Outline of Production, as augmented by APHIS's regulations, was not effectively screening that vaccine, but that realization, if it in fact existed, does not sustain the Plaintiffs' effort to enforce requirements which are different from, or in addition to, those promulgated by APHIS. Of necessity, the Plaintiffs would have to do so, since they have presented no proof that the only standard they have identified—that of viricidal activity, as determined by APHIS—was breached.

As the Court of Appeals noted, in *Lynnbrook Farms,* in promulgating its preemption regulations, APHIS expressly declared, "where safety, efficacy, purity, and potency of biological products are concerned, it is the agency's intent to occupy the field." *Lynnbrook Farms v. Smithkline Beecham Corp.,* supra at 625, quoting 57 *Fed.Reg.* 38758, 38759 (August 27, 1992). Plainly, in occupying the field, APHIS can exercise regulatory powers that are denied to private litigants through State law claims, as "States are not free to impose requirements which are different from, or in addition to, those imposed by USDA regarding the safety, efficacy, potency, or purity of a product." *Symens I,* supra at 1053, quoting 57 *Fed.Reg.* 38758, 38759.

Apparently, the Plaintiffs would offer proof which, they claim, demonstrates that PB13 was, in fact, viricidal. Accepting that proof as established, for this limited purpose only, it should be sufficient to note that there is no evidence that the tests, which support that proof, comport with APHIS requirements.[10] APHIS has regu-

---

10. In his affidavit, Dr. Wustenberg avers that he has reviewed the laboratory data of a Dr. John W. Black, who had "performed laboratory tests of his own to determine whether the product demonstrated viricidal activity," and has concluded that Dr. Blacks' laboratory data "demonstrate[d] that the PB13 product was viricidal." *Affidavit of William Wustenberg,* at p. 5. In describing Dr. Black's testing, however, Dr. Wustenberg discloses that Dr. Black "conducted a viricidal activity assay using his own canine distemper virus isolate that was well adapted to grow on the canine tissue cultures used in his laboratory." *Exhibit B, attached to Affidavit of William Wustenberg, DVM,* at p. 11. However, APHIS requires viricidal activity testing to be performed on embryonated eggs, and not on canine tissue cultures. As such, the results of Dr. Black's experiments would impose upon the Defendant a test of viricidal activity different from, or in addition to, that prescribed by APHIS's regulations. See, *9 C.F.R. § 113.302.*

The only other evidence that the Plaintiffs identify as suggesting that PB13 was viricidal is a report from a Dr. Victor M. Becerra, of

lations concerning how a manufacturer must screen its vaccines. Were the Defendant now to be subject to proof based on tests which do not comply with those regulations, we would plainly be subjecting the Defendant to requirements that would be different from, or in addition to, those promulgated by APHIS—the agency which occupies this field of regulation.[11]

Since each of the Plaintiffs' claims for negligence, strict liability, and for implied warranties of fitness for a particular purpose, or for merchantability, would impose requirements different from, or in addition to, those of APHIS, we grant the Defendant's Motion for Summary Judgment as to those claims.[12] See, *SmithKline Beecham Corp.*, Civ. No. 94–103 at pp. 7–9 (D.S.D., September 30, 1999), aff'd, 7 Fed. Appx. 534, 2001 WL 263058 (8th Cir.2001); *Lynnbrook Farms v. Smithkline Beecham Corp.*, supra at 630; *Cooper v. United Vaccines*, supra at 871; *Brandt v. Marshall Animal Clinic*, supra at 878. We recognize, as Courts generally do when addressing issues of preemption, that the result we reach appears harsh when squared with the just notion that every wrong, if proved, deserves a remedy. See, e.g., *Lynnbrook Farms v. Smithkline Beecham Corp.*, supra at 630; *Murphy v. SmithKline Beecham Corp.*, supra at 818; *Brandt v. Marshall Animal Clinic*, supra at 878. Nor do we think that it provides the Plaintiffs with much solace to know that, had these claims been litigated in the Minnesota Courts, the same preemption would have been found to exist. See, *Brandt v. Marshall Animal Clinic*, supra at 878. Nevertheless, we are not jurisdictionally positioned to weigh the pros and cons of APHIS's preemption policy, nor are we at liberty to ignore the precedential authority, in this Circuit, that APHIS permissibly exercised the authority, which had been vested by VSTA, in creating a field of preemption which precludes the Plaintiffs' claims for negligence, for strict liability, and for breach of implied warranties.

2. *The Plaintiffs' Claims for a Breach of Express Warranties, for False Representation, and for violation of the Minnesota Consumer Fraud Act.*

■ In their Complaint, the Plaintiffs predicate their breach of express warranties claim upon two representations they

the USDA, which Dr. Wustenberg has identified in his written report. See, *Exhibit C attached to Affidavit of William Wustenberg, DVM.* The Plaintiffs assert that Dr. Becerra's review of the Defendant's bench records, "relative to various PB serials during the fall of 1999 and winter of 2000, * * * confirmed viricidal activity in the products tested." *Plaintiff's Brief* at 19. Our review of Dr. Becerra's written report, however, discloses no reference to serial PB13, or inferentially related to it. Accordingly, the Record as presented is bereft of any showing that PB13 was viricidal, under the test prescribed by APHIS.

11. For the same reason, the Plaintiffs' reliance upon the estoppel doctrine is unavailing, even if we concluded that the doctrine was otherwise applicable. The only substantive requirement of APHIS, which the Plaintiffs have identified as eluding the Defendant's compliance, is the failure to report a "No test," we must, as we have explained, look to the evidence of Record to determine whether the Plaintiffs can demonstrate that PB13 was viricidal under the APHIS regulations, or we would be subjecting the Defendant to requirements which are substantively distinct from those of APHIS. The Plaintiffs have failed to present such evidence.

12. An exhaustive recitation of the elements of proof for each of these causes is unnecessary. Under *Symens I and Symens II*, to be exempt from preemption, each of these claims would require proof that the Defendant violated a requirement of APHIS and, as we have already detailed, here that would require the Plaintiffs to demonstrate that PB13 was in fact, viricidal under APHIS's testing. The Plaintiffs have failed to meet that burden apart from offering, as proof, testing that was not imposed by APHIS.

**962**

attribute to the Defendant. First, they allege that, prior to their purchase of the Defendant's product, a representative of the Defendant stated to the Plaintiffs, on several occasions, that the Defendant's mink vaccine was "95 per cent effective in preventing distemper in mink." *Plaintiffs' Complaint*, at p. 2, and 5. In addition, the Plaintiffs allege that they "purchased and used the distemper vaccine in reasonable reliance upon material representations of facts and warranties made by defendant on the package label and insert, which included representations that the distemper vaccine 'aids in preventing distemper' and 'BIOCOM–DP has been demonstrated to be a safe and efficacious aid in preventing distemper.'" *Id.* at p. 2–3. The Defendant does not deny that these representations were made, but relies upon *Cooper v. United Vaccines, Inc.*, supra at 871–72, in urging that the Plaintiffs' express warranty claim is preempted.

We find that the Defendant is correct as to the label and insert representation, for APHIS approved that label and packaging, and a Jury would have no right, under State law, to question the propriety of that approval process, for that would invoke a requirement different from, or in addition to, the requirements established by APHIS. See, *Cooper v. United Vaccines, Inc.*, supra at 872; *Murphy v. SmithKline Beecham Corp.*, supra at 818 ("APHIS has also stated that states may not impose 'labeling requirements which are different from or in addition to those in the regulations under [VSTA].'"), quoting 57 *Fed. Reg.* at 38759; *Symens I*, supra at 1053 (same). Accordingly, the Plaintiffs' ex-

press warranty claim, which is predicated upon the labeling, and packaging of the Defendant's product, is preempted, and the Defendant is entitled to the entry of Summary Judgment as to that claim. Further, because the Plaintiff's false representation, and Minnesota Consumer Fraud Act [13] claims, constitute essentially the same claim, as that presented by the asserted express warranty, but in different garb, we are persuaded that the Defendant is entitled to the entry of Summary Judgment as to that part of those claims which are predicated on the product's labeling and packaging.

■ We think a different result is required, however, with respect to the "95 per cent effective" claim, as that does not emanate from the labeling or packaging of the Defendant's product, but appears to be a promotional representation employed by the Defendant's Director of Sales and Marketing. Although it appears that the promotional statements made by the Defendant's representative here, are the same, or similar to, the promotional statements that were before the Court in *Cooper*, that decision merely refers to "statements allegedly made by [United Vaccines Inc.'s] representatives regarding the high 'field effectiveness' of the vaccine * * *." *Id.* There, the Court concluded that "[t]hese representations are not 'substantially different' from those set forth in the APHIS-approved labeling and packaging that accompanied Biocom–DP" "[a]nd, because they concern the efficacy of the vaccine, a jury would have to find that the vaccine was ineffective in order to return a

**13.** The Minnesota Consumer Fraud Act provides, in pertinent part:

The act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether not any per-

son has in fact been mislead, deceived, or damaged thereby, is enjoinable as provided herein.

*Minnesota Statutes § 325F.69 (subd. 1).*

Under Minnesota Statutes § 8.31, an plaintiff may bring a claim for damages for a violation of this act.

verdict for [the plaintiff]." *Id.* However, the *Cooper* Court failed to address the Supreme Court's analysis in *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992) (plurality opinion), in reaching its determination that the express warranty claim was preempted.

In *Cipollone,* the Court was considering the preemptive breadth of the Federal Cigarette Labeling and Advertising Act of 1965, and its successor, the Public Health Cigarette Smoking Act of 1969. The Court concluded that the Act did not preempt State law claims, which were premised upon express warranties, and reasoned as follows:

> A manufacturer's liability for breach of an express warranty derives from, and is measured by the terms of that warranty. Accordingly, the "requirement[s]" imposed by an express warranty claim are not "imposed under State law," but rather are imposed **by the warrantor**. If, for example, a manufacturer expressly promised to pay a smoker's medical bills if she contracted emphysema, the duty to honor that promise could not fairly be said to be "imposed under state law," but rather is best understood as undertaken by the manufacturer itself. While the general duty not to breach warranties arises under state law, the particular "requirement * * * based on smoking and health * * * with respect to the advertising or promotion [of] cigarettes" in an express warranty claim arises from the manufacturer's statements in its advertisements. In short, a common-law remedy for a contractual commitment voluntarily undertaken should not be regarded as a "requirement * * * **imposed under State law**" within the meaning of [Federal Cigarette Labeling and Advertising Act] § 5(b).

*Cipollone v. Liggett Group, Inc.,* supra at 525–26, 112 S.Ct. 2608 [emphasis in original].

Subsequently, in *American Airlines, Inc. v. Wolens,* 513 U.S. 219, 115 S.Ct. 817, 130 L.Ed.2d 715 (1995), the Supreme Court returned to the same line of analysis but, on this occasion, in determining the preemptive scope of the Airline Deregulation Act of 1978. Once again, the Court declined to extend preemption to State law express warranty claims, reasoning as follows:

> We do not read the [Airline Deregulation Act's] preemption clause * * * to shelter airlines from suits alleging no violation of state-imposed obligations, but seeking recovery solely for the airline's alleged breach of its own, self-imposed undertakings. As persuasively argued by the United States, terms and conditions airlines offer and passengers accept are privately ordered obligations and thus do not amount to State's 'enact[ment] or enforce[ment] [of] any law, rule, regulation, standard, or other provision having the force and effect of law' within the meaning of [§ ] 1305(a)(1). * * * Cf. *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 526, 112 S.Ct. 2608, 2612, 120 L.Ed.2d 407 (1992) (plurality opinion) ("[A] common-law remedy for a contractual commitment voluntarily undertaken should not be regarded as a 'requirement * * * imposed under State law' within the meaning of [Federal Cigarette Labeling and Advertising Act] § 5(b)."). A remedy confined to a contract's terms simply holds parties to their agreements—in this instance, to business judgments an airline made public about its rates and services.

*Id.* at 228–29, 115 S.Ct. 817.

*Cipollone* has played a role in each of the decisions we have relied upon. In *Murphy,* the Court observed that, in *Cipollone,*

the "Supreme Court examined statutory language similar to that contained in the APHIS regulations," *Murphy v. Smith-Kline Beecham Corp.,* supra at 816, while the Court, in *Lynnbrook Farms,* extensively examined the Court's holding, in *Cipollone,* when ascertaining the limits of the preemption limned by APHIS. See, *Lynnbrook Farms v. Smithkline Beecham Corp.,* supra at 627–29. Our own Court of Appeals, in *Symens I,* considered *Cipollone,* and cited it for the proposition that "some" State common law claims were preempted as a result of the Court's analysis there. *Symens I,* supra at 1055; see also, *Brandt v. Marshall Animal Clinic,* supra at 877 (citing *Cipollone* for the proposition that the preemptive scope of the Federal Cigarette Labeling and Advertising Act "was governed only by its particular language so that the Act did not preempt such common law claims as express warranty or misrepresentation * * *.") .

In *Symens I,* our Court of Appeals concluded that "there is strong evidence that APHIS did not intend to entirely preempt common law remedies." *Symens I,* supra at 1055. As expressed by APHIS, the intent to preempt was fostered by the concern that "additional or different requirements would thwart the Congressional intent regarding uniform national standards, and would usurp USDA's authority to determine which biologics are pure, safe, potent and efficacious." *Lynnbrook Farms v. Smithkline Beecham Corp.,* supra at 625, quoting 57 *Fed.Reg.* 38758, 38759. Excluding express warranties from preemption would not frustrate "uniform national standards," nor would it "usurp USDA's authority to determine which biologics are pure, safe, potent and efficacious." Rather, holding manufacturers to their promises, as to the safety of their products, would advance the purposes of the APHIS regulations, by either encouraging manufacturers not to make representations—outside those approved by APHIS—which they do not intend to honor, or by holding them responsible for the representations that they do voluntarily offer in promoting sales.

We wish to make plain that, unlike the circumstances considered by our Court of Appeals in *Welchert v. American Cyanamid, Inc.,* 59 F.3d 69, 72 (8th Cir.1995), where the Court was considering the preemptive breadth of FIFRA, we are not confronted, here, with representations which mirror those contained in the Defendant's labeling and packaging. In *Welchert,* the Court concluded that the express warranty claim of the plaintiff, there, was preempted, reasoning as follows:

> The express warranty claim of the [plaintiffs] is based entirely on the label's statement with regard to the herbicide's carryover effect. They have not alleged that [the defendant] made any other statements with regard to the product which might serve as the basis for their express warranty claim. As noted in *Worm* [*v. American Cyanamid Co.,* 5 F.3d 744 (4th Cir.1993) ], federal regulation requires a pesticide manufacturer to provide labeling information about rotational crop restrictions. * * * [The defendant's] label statement on rotational crop use is thus a mandated disclosure, not a "voluntarily undertaken" promise.
>
> *        *        *        *        *        *

In the present case, like Worm, the [plaintiff's] express warranty claim arose solely on the basis of a labeling statement specifically required by federal law and approved by the EPA. For the purposes of our preemption analysis in the present case, we believe that the Fourth Circuit's use of the phrase "required and approved by the EPA," when characterizing the label statement challenged by the plaintiff's in that case, properly lim-

its the scope of FIFRA's preemption of state law breach of express warranty claims.

*Id.* at 72–73.

Here, the Defendant's promotional statement, that its product would be "95 per cent effective," was not required by any APHIS labeling requirement, at least as disclosed in this Record, and we are unable to conclude, as the Court did in *Cooper*, that the representation was "not 'substantially different' " from the statements "set forth in the APHIS-approved labeling and packaging that accompanied Biocom–DP." *Cooper v. United Vaccines, Inc.*, supra at 872.[14] To assure consumers, that a product is effective in preventing distemper—to the extent of a finite, quantified percentage—is starkly different from assuring that the product "aids in the prevention of," or "produces a significant effect."

As a consequence, under the circumstances presented here, we conclude that the Plaintiff's express warranty claim is not preempted by APHIS, and we deny the entry of Summary Judgment, in favor of the Defendant, on that claim. Moreover, because, as we have previously stated, the Plaintiff's false representation and Minnesota Consumer Fraud Act claims effectively constitute the same substantive cause of action, we are persuaded that those claims also properly elude Summary Judgment. Again, holding the Defendant to assurances that it gave to the Plaintiffs, either knowing that the assurances were false, or without a sufficient basis to conclude that the assurances were true or false, does no more than hold the Defendant at its own peril for making statements, not required by the APHIS regulations, which either are known to be false, or which are uttered with a disregard for their truth or falsity.[15] We are aware of no regulatory authority, in APHIS, which would be dissipated, in any respect, by allowing the Plaintiff's false representation claim to proceed.

As the Supreme Court explained, in *Cipollone v. Liggett Group, Inc.*, supra at 528–529, 112 S.Ct. 2608:

> [The] petitioner's fraudulent-misrepresentation claims that do arise with respect to advertising and promotions (most notably claims based on allegedly false statements of material fact made in advertisements) are not preempted by [Federal Cigarette Labeling and Advertising Act] § 5(b). Such claims are

---

**14.** The Plaintiffs do provide a copy of "the May 12, 1995 Veterinary Biologics General Licencing Considerations No. 800.200," which was addressed to all "Veterinary Biologics Licensees, Permitees, and Applicants." *Exhibit I* attached to *Affidavit of Todd M. Johnson.* The document states that its purpose is to "provide guidance for developing data to support an Application for a U.S. Veterinary Biological Product License or U.S. Veterinary Biological Product Permit for Distribution and Sale." *Id.* In the section labeled "Data Requirements," the document details that employing the legend that the product "aids in the prevention of," requires a showing that the product was "demonstrated to produce a significant effect in achieving the claim," whereas the legend, "[f]or prevention of disease due to (certain microorganism) should be reserved for those products shown to be highly effective (95% confidence that they are at least 80% effective) in the prevention of clinical disease in vaccinated and challenged animals." *Id.* Here, the Defendant's label claimed that its product "aids in prevention of distemper," see *Plaintiffs' Complaint*, at p. 2, which we cannot, as did the Court in *Cooper*, accept as being substantially the same as the express warranty that the product was "95 percent effective."

**15.** Of course, we make no such finding here for, under the Summary Judgment standard of review, we are obligated to assume the truth of the Plaintiffs' allegations, and all reasonable inferences that may be drawn from those allegations. Whether the representations were actually made, and the extent to which they were true or false, if made, remains to be proven at Trial.

predicated not on a duty "based on smoking and health" but rather on a more general obligation [—] the duty not to deceive. * * *

\* \* \* \* \* \*

State-law prohibitions on false statements of material fact do not create "diverse, nonuniform and confusing" standards. Unlike state-law obligations concerning the warning necessary to render a product "reasonably safe," state-law proscriptions on intentional fraud rely only on a single, uniform standard: falsity. Thus, we conclude that the phrase "based on smoking and health" fairly but narrowly construed does not encompass the more general duty not to make fraudulent statements. Accordingly, petitioner's claim based on allegedly fraudulent statements made in respondents' advertisements is not preempted by § 5(b) of the 1969 Act.

The language employed by APHIS, that expresses its preemptive intent, also does not encompass, either directly or by implication, the more general duty that manufacturers owe to the consuming public not to make false statements in their advertisements, or promotions, when those statements have not been approved by APHIS. We are confident that APHIS can properly police, and sanction, those false statements, if any there be, in statements offered to APHIS for incorporation into APHIS-approved labeling and packaging, but we are aware of no mechanism, at least as disclosed in this Record, which extends APHIS's policing powers to advertisements, or promotional statements, which are not submitted to APHIS for approval. Accordingly, we find no tension between APHIS's occupation of the regulating the field concerning the "safety, efficacy, purity, and potency of biologic products," see 57 *Fed.Reg.* 38758, 38759, and allowing alleged false representation claims to proceed, as to promotional repre-

sentations, which are not contained in APHIS-approved labeling and packaging.

Accordingly, we grant the Defendant's Motion for Summary Judgment as to that aspect of the express warranty, false representation, and Minnesota Consumer Fraud Act claims, which relate to statements contained in the Defendant's packaging and labeling of the vaccine in question, but we deny the Defendant's Motion as to the Plaintiff's express warranty, false representation, and Minnesota Consumer Fraud Act claims, which arise from the representation that the product would be "95 per cent effective."

NOW, THEREFORE, It is—

ORDERED:

That the Defendant's Motion for Summary Judgment [Docket No. 24], is GRANTED in part, and DENIED in part, as more fully detailed in the text of this Order.